# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### CIVIL CASE NO. 2:12-cv-00042-MR

ANNA GIABOURANI,                )
                                )
              Plaintiff,        )
                                )
        vs.                     )    **MEMORANDUM OF**
                                )    **DECISION AND ORDER**
WELLS FARGO BANK, N.A.,         )
                                )
              Defendant.        )
_____ )

**THIS MATTER** is before the Court on the Defendant's Motion for

Summary Judgment [Doc. 55].

## I.    PROCEDURAL BACKGROUND

This action arises from the Plaintiff Anna Giabourani's purchase of Lot

5 and Lot 32 (collectively, the "River Rock Lots") in the Bear Pen section of

River Rock, a planned resort community in North Carolina.[1]  After signing

purchase agreements for these lots, the Plaintiff turned to the Defendant

Wells Fargo Bank, N.A. ("Wells Fargo")[2] to finance her purchase.   The

_____

[1] The Plaintiff's Complaint also asserted claims with respect to the Plaintiff's purchase of lots in Phase I-A of The Bluffs at Cape Fear, a development near Wilmington, North Carolina, and the financing of those lot purchases by Wells Fargo.  [See Doc. 1].  The parties have settled their dispute regarding these lots.  [Doc. 57].  Therefore, the Court will limit its discussion in this Order to the Plaintiff's River Rock lot purchases only.

[2] The loans at issue in this case actually originated with Wachovia Bank, N.A.

developer of River Rock, Legasus, failed to complete the infrastructure and amenities in the subdivision and subsequently became insolvent, leaving the Plaintiff owning land with a value significantly lower than the original purchase price. The Plaintiff now brings this action against Wells Fargo, seeking to hold her lender legally responsible for her losses.

The Plaintiff initially brought suit in one mass action with other borrower-plaintiffs on July 19, 2011, but the Court severed all claims. Beritelli, et al. v. Wells Fargo Bank, N.A., et al., Civil Case No. 1:11-cv-00179-MR (filed July 19, 2011). The Plaintiff then refiled an individual Complaint. Wells Fargo in turn asserted a counterclaim against the Plaintiff for breach of contract due to her failure to pay amounts owed under promissory notes she entered into in conjunction with her refinancing of the River Rock loans. [Doc. 36]. Following the Court's Order granting in part and denying in part Wells Fargo's Motion to Dismiss, the only claims of the Plaintiff to remain are those for fraud and for violations of the Interstate Land Sales Act ("ILSA") and the North Carolina Unfair and Deceptive Trade

_____

Subsequent to the transactions at issue in this litigation, Wells Fargo became the successor by merger to Wachovia. Accordingly, for ease of reference, the Court will refer to the lender in this matter simply as "Wells Fargo."

Practices Act ("Chapter 75"), along with Wells Fargo's counterclaim for breach of contract.

Wells Fargo now seeks summary judgment on the Plaintiff's remaining claims and its counterclaim for breach of contract. For the reasons that follow, Wells Fargo's motion will be granted.

## II. STANDARD OF REVIEW

In reviewing a party's motion for summary judgment, this Court is mindful that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the case." N&O Pub. Co. v. RDU Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010). A "genuine dispute" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A party asserting that a fact cannot be genuinely disputed must support its assertion with citations to the record. Fed. R. Civ. P. 56(c)(1). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003). If

this showing is made, the burden then shifts to the non-moving party who must convince the Court that a triable issue exists.  Id.  Finally, in considering the motion for summary judgment filed by the defendant, the Court must view the pleadings and materials presented in the light most favorable to the plaintiff as the non-movant and must draw all reasonable inferences in the plaintiff's favor as well.  Adams v. UNC Wilmington, 640 F.3d 550, 556 (4th Cir. 2011).

## III.    FACTUAL BACKGROUND

Viewing the forecast of evidence in the light most favorable to the Plaintiff, the following is a summary of the relevant facts.

As of April 2015, the Plaintiff was a "corporate bank finance lawyer" and a "mortgage analyst" in the New York office of an international law firm. [Doc. 55-1: Deposition of Anna Giabourani ("Pl.'s Dep.") at 120, 263].[3] Before that, she spent twelve years working in the "banking and institutional investing group" at one of the five largest law firms in the United States and representing financial institutions and private equity funds at another large law firm.  [Id. at 261-63; Doc. 55-15: Pl.'s Resp. to Interrog. 14]. The Plaintiff

---

[3] Shortly after her deposition in this matter, the Plaintiff left her employment in order to move to Greece, where she currently resides.

had a New York real estate license when she purchased the River Rock lots, and she has considerable real estate investing experience. [Doc. 55-1: Pl.'s Dep. at 19, 21-22, 24-25, 28-31]. In addition to the River Rock lots at issue in the present litigation, the Plaintiff has purchased two condominiums in Panama, bought eight condominiums in Florida for the purpose of converting them into "a condo hotel development," invested in a planned development in Morocco, purchased a condominium along the Red Sea in Egypt, and has purchased two primary residences in New York. [Id.].

In late 2005 or early 2006, the Plaintiff began conducting online research into real estate in North Carolina, which she believed to be a "very good destination[ ] for real estate investments because of the baby boomers retiring there." [Id. at 31-33, 35, 66]. She eventually came across the website of Paul Tarins, a Florida real estate broker who promoted real estate opportunities in North Carolina and elsewhere. [Id. at 33-34]. She later contacted Mr. Tarins regarding real estate projects near Asheville — an area she knew "quite well" — and Mr. Tarins responded by introducing her to River Rock. [Id. at 35; Doc. 55-15: Pl.'s Resp. to Interrog. No. 2].

During their communications, Mr. Tarins "promote[d] the project," he "was very comfortable talking about values of lots and prices and location and the developer's next steps," and he stated that River Rock's developer,

Legasus, was "reputable" and had a history of success. [Pl.'s Dep., Doc. 55-1 at 35-36].

On February 17, 2006, the Plaintiff executed two purchase agreements (the "River Rock Purchase Agreements") pursuant to which she agreed to purchase the River Rock Lots. [Doc. 55-15: Pl.'s Resp. to Req. for Admission ("RFA") Nos. 3-4; Doc. 55-1: Pl.'s Dep. at 165-167, Exs. 16-17]. On March 1, 2006, nearly two weeks after executing the River Rock Purchase Agreements, the Plaintiff contacted Elizabeth Madden, a Wells Fargo loan officer, in order to discuss financing. [Doc. 55-1: Pl.'s Dep. at 83-84, Ex. 3 at 7].[4] The Plaintiff ultimately financed her purchase of the River Rock Lots with Wells Fargo loans (the "River Rock Loans"), which were evidenced by two March 2006 promissory notes (the "River Rock Notes"). [Id. at 93-97, Exs. 5-6; Doc. 55-15: Pl.'s Resp. to RFA Nos. 1-2].

Prior to the closings, the Plaintiff asked Madden for copies of the River Rock lot appraisals but did not receive them. [Doc. 55-1: Pl.'s Dep. at 116]. The Plaintiff testified that instead of the requested appraisals, she received "very, very strong reassurances" from Madden that the appraisals were not

---

[4] Mr. Tarins initially directed the Plaintiff to a different entity, United Capital Mortgage, for financing. [Doc. 55-1: Pl.'s Dep. at 79-83, 257-258, Ex. 3 at 3-4, 6-7]. After United Capital Mortgage failed to respond to the Plaintiff's submission of a personal financial statement, Mr. Tarins recommended that the Plaintiff contact Wells Fargo. [Id.].

needed and that the Plaintiff should not be concerned about the appraisals "because the values on the property had come in higher than the purchase price reflected on the note." [Id. at 118].

In a series of telephone conversations with Madden, the Plaintiff "questioned a number of aspects of the financing terms surrounding these loans" but she "decided to go ahead with [the closings] because of [Madden's] reassurances." [Doc. 58-1: Pl.'s Dep. at 155-56]. The Plaintiff testified that Madden gave Plaintiff the impression that she (the Plaintiff) was having "conversations with an investment banker on a road show trying to promote a deal that they had just underwritten. She was talking the language of an investment banker and not the language of a loan officer trying to respond to a simple question, what is interest rate of the loans." [Id. at 156]. The Plaintiff further testified that it appeared that Madden "knew very well what she was talking about when we were discussing real estate." [Id. at 157].

At that point in time, the Plaintiff testified, there was "no reason for [her] to doubt what [she] heard from [Madden]." [Id. at 164]. The Plaintiff testified that Madden was

> very professional, very convincing, very reassuring,
> very much reinforcing the validity of the due diligence
> the bank had done. I had nothing to worry about. . . .

7

> I was completely reassured by a professional who gave me the impression she knew very well what she was talking about. She knew the project inside out. And she, she couldn't have been pretending. She believed everything she was telling me. . . . That's the impression I got.

[Id. at 164-65].

When the Plaintiff expressed concern about the price of the lots that she had agreed to purchase, Madden reassured the Plaintiff that her lots were "not very expensive lots" and that their pricing was "pretty much in line with other similarly situated lots of raw land in North Carolina." [Id. at 185]. The Plaintiff was aware that Madden had been involved in closing other River Rock lots. [Id. at 186]. The Plaintiff testified that Madden answered the Plaintiff's questions "in a very definitive manner which was actually very reassuring to me. Like, she had done closing for other developments." [Id. at 187].

The Plaintiff further testified that Madden assured her there would be no reason to refinance, as she would be able to completely pay off the loans by selling off the lots in the next upcoming release phases. [Id. at 193]. The Plaintiff testified that Madden referred to these lots as a "sure profit" and a "solid investment." [Id. at 206-07].

When the notes came due in 2008, the Plaintiff exercised the option to refinance the loans. [Id. at 101]. The Plaintiff personally executed two promissory notes in conjunction with these refinances (the "River Rock Refinance Notes"). [Doc. 55-15: Pl.'s Resp. to RFA Nos. 1-2; Doc. 55-1: Pl.'s Dep. at 103-106, Exs. 9-10]. After she refinanced her original loan, the Plaintiff became concerned "that these lots would never be able to be sold." [Doc. 55-1: Pl.'s Dep. at 122-23]. In early 2010, the Plaintiff "started really investigating the circumstances under which those loans were originated," and she ultimately stopped making payments on the notes. [Doc. 55-1: Pl.'s Dep. at 108-09, 123; Doc. 55-15: Pl.'s Resp. to RFA Nos. 17-20; Affidavit of Michael D. Morin ("Morin Aff.), Doc. 55-17 at ¶ 9].

The Plaintiff's River Rock Refinance Notes were executed in favor of Wachovia, and Wells Fargo is the successor-in-interest by merger to Wachovia. [Morin Aff., Doc. 55-17 at ¶¶ 2, 4-6]. Wells Fargo is the current holder and owner of the original River Rock Refinance Notes, which have not been otherwise endorsed, transferred, or assigned. [Id. at ¶¶ 15-16].

## IV. DISCUSSION

### A. Statute of Limitations

In the present case, the Plaintiff asserts claims for fraud, violations of Chapter 75, and violations of ILSA. Under North Carolina law, the statute of

limitations applicable to fraud claims is three years.  <u>See</u> N.C. Gen. Stat. § 1-52(9).   This three-year statute of limitations begins to run "from the discovery of the fraud or from the time it should have been discovered in the exercise of reasonable diligence."  <u>Hunter v. Guardian Life Ins. Co.</u>, 162 N.C. App. 477, 485, 593 S.E.2d 595, 601, <u>disc. rev. denied</u>, 358 N.C. 543, 599 S.E.2d 48 (2004) (citation omitted).

Claims under Chapter 75 are subject to a four-year statute of limitations.  <u>See</u> N.C. Gen. Stat. § 75-16.2.   While a Chapter 75 claim generally accrues when the violation of the statute occurs, <u>see</u> <u>Jones v. Asheville Radiological Group, PA</u>, 134 N.C. App. 520, 527, 518 S.E.2d 528, 533 (1999), <u>rev'd in part on other grounds</u>, 351 N.C. 348, 524 S.E.2d 804 (2000), where the claim is based on fraudulent conduct, courts have determined that the cause of action arises at the time that the fraudulent conduct was discovered or should have been discovered with the exercise of due diligence.   <u>See, e.g.</u>, <u>Faircloth v. Nat'l Home Loan Corp.</u>, 313 F.Supp.2d 544, 553-54 (M.D.N.C. 2003), <u>aff'd</u>, 87 F. App'x 314 (2004).

Finally, ILSA claims are subject to a three-year statute of limitations. <u>See</u> 15 U.S.C. § 1711.  The accrual date of an ILSA claim, however, depends on the particular type of claim being asserted.  For example, for an alleged

violation of § 1703(a)(2)(A), (a)(2)(B), or (a)(2)(C)[5], the statute of limitations expires "three years after discovery of the violation or after discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 1711(a)(2). The statute of limitations for an alleged violation of § 1702(a)(2)(D)[6] expires three years after the date of signing of the contract of sale. See 15 U.S.C. § 1711(a)(1). This limitations period, however, may be subject to equitable tolling if the plaintiffs can demonstrate "(1) that they exercised due diligence to discover their cause of action before the

---

[5] Subsections (A)-(C) of § 1703(a)(2) makes it unlawful for a developer or an agent of a developer to make use of any means of interstate communication or transportation, with respect to the sale or lease, or offer to sell or lease, of property:

> (A) to employ any device, scheme, or artifice to defraud;

> (B) to obtain money or property by means of any untrue statement of a material fact, or any omission to state a material fact necessary in order to make the statements made (in light of the circumstances in which they were made and within the context of the overall offer and sale or lease) not misleading, with respect to any information pertinent to the lot or subdivision; [or]

> (C) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser[.]

15 U.S.C. § 1703(a)(2)(A)-(C).

[6] Section 1703(a)(2)(D) makes it unlawful for a developer or an agent of a developer to make use of any means of interstate communication or transportation, with respect to the sale or lease, or offer to sell or lease, of property, "to represent that roads, sewer, water, gas, or electric service or recreational amenities will be provided or completed by the developer without stipulating in the contract of sale or lease that such services or amenities will be provided or completed." 15 U.S.C. § 1703(a)(2)(D).

limitations period ran; and (2) that the defendant committed an affirmative act of fraudulent concealment to frustrate discovery despite due diligence." Orsi v. Kirkwood, 999 F.2d 86, 89 (4th Cir. 1993); Lukenas v. Bryce's Mountain Resorts, Inc., 538 F.2d 594, 597 (4th Cir. 1976); Dexter v. Lake Creek Corp., No. 7:10-CV-226-D, 2013 WL 1898381, at *4 (E.D.N.C. May 7, 2013).

Generally, under North Carolina law, the issue of "when fraud should be discovered in the exercise of reasonable diligence is a question of fact for the jury." State Farm Fire and Cas. Co. v. Darsie, 161 N.C. App. 542, 548 S.E.2d 391, 397 (2003). Where, however, "the evidence is clear and shows without conflict that the claimant had both the capacity and opportunity to discover the fraud but failed to do so, the absence of reasonable diligence is established as a matter of law." Drinkard v. Walnut Street Sec., Inc., No. 3:09-cv-66-FDW, 2009 WL 1322591, at *2 (W.D.N.C. May 11, 2009) (citation omitted).

Here, viewing the forecast of evidence in the light most favorable to the Plaintiff, the Court concludes that the undisputed forecast of evidence demonstrates that the Plaintiff's claims are time barred. The Plaintiff executed the Purchase Agreement for the Lots in February 2006, yet she waited more than five years to initiate this action. The Plaintiff has failed to

present a forecast of evidence that she did *anything* in this interim period to discover her causes of action against Wells Fargo, nor has she shown that Wells Fargo committed any affirmative act of fraudulent concealment to frustrate discovery despite her due diligence.

For all of these reasons, the Court concludes that the Plaintiff's claims are time-barred.

## B.   ILSA Claim

Even if the Plaintiff's claims were not time-barred, the Plaintiff's claims under the ILSA are also subject to dismissal because the Plaintiff has failed to present a forecast of evidence that Wells Fargo is a "developer" or "agent" within the meaning of the Act or that Wells Fargo engaged in a scheme to defraud the Plaintiff during the lot purchase.

The ILSA "is designed to prevent false and deceptive practices in the sale of unimproved tracts of land by requiring developers to disclose information needed by potential buyers." Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla., 426 U.S. 776, 778 (1976). "The Act also requires sellers to inform buyers, prior to purchase, of facts which would enable a reasonably prudent individual to make an informed decision about purchasing a piece of real property." Burns v. Duplin Land Dev., Inc., 621 F.Supp.2d 292, 301 (E.D.N.C. 2009).

An individual who purchases a lot may bring a civil action under the ILSA against a "developer or agent" who violates Section 1703(a). 15 U.S.C. § 1709; see also Burns, 621 F.Supp.2d at 301. A "developer" is defined as "any person who, directly or indirectly, sells or leases, or offers to sell or lease, or advertises for sale or lease any lots in a subdivision. . . ." 15 U.S.C. § 1701(5). An "agent" is defined as "any person who represents, or acts for or on behalf of, a developer in selling or leasing, or offering to sell or lease, any lot or lots in a subdivision. . . ." 15 U.S.C. § 1701(6).

Generally speaking, a lending institution acting in the ordinary course of its business is not considered a "developer" within the meaning of the ILSA. See Cumberland Cap. Corp. v. Harris, 621 F.2d 246, 251 (6th Cir. 1980); Kenneally v. Bank of Nova Scotia, 711 F.Supp.2d 1174, 1191-92 (S.D. Cal. 2010) (collecting cases); Hammar v. Cost Control Mktg. and Sales Mgmt. of Va., Inc., 757 F. Supp. 698, 702 (W.D. Va. 1990). "It is only where a financial institution acts beyond its ordinary course of dealing as a lending institution and participates in the actual development, marketing or sale of property that liability may arise under ILSA." Thompson v. Bank of Am., No. 7:09-CV-89-H, 2011 WL 1253163, at *1 (E.D.N.C. Mar. 30, 2011) (citations omitted).

As the United States District Court for the Western District of Virginia has explained:

> When a financial institution allows its name to be used in advertisements or announcements for a development, it is in effect lending its prestige and good name to the sales effort. It is participating to an unacceptable degree in the marketing of the project. It has gone beyond its function as a commercial bank to lot purchasers.

Hammar, 757 F. Supp. at 702-03.

The Fourth Circuit recently reached a similar conclusion, holding that the anti-fraud provision of the ILSA "encompasses entities that participated in the advertising and promotional efforts leading to a challenged real estate transaction, even if they ultimately were not party to the transaction." In re Total Realty Mgmt., LLC, 706 F.3d 245, 253 (4th Cir. 2013) (finding complaint stated plausible allegations to support ILSA claim where it was alleged that marketer's representatives spoke at developer's sales seminars and disseminated its marketing materials there as well as on the developer's website).

Here, the Plaintiff has failed to present a forecast of evidence that the Bank was a co-developer with or agent of Legasus. The Plaintiff has provided no forecast of evidence that Wells Fargo participated in the actual development of River Rock or that Wells Fargo was the seller of any lots in

this development, including the Plaintiff's lots. Indeed, it is undisputed that the Plaintiff had committed to purchasing the lots at issue before she ever even spoke to a Wells Fargo loan officer. To the extent that the Plaintiff contends that Wells Fargo engaged in marketing activities on behalf of the developer, the Plaintiff has failed to present a forecast of evidence that any such alleged representations went beyond the ordinary course of dealing with a bank selling loan products to interested customers. In fact, the Plaintiff has not presented any forecast of evidence that Wells Fargo engaged in any marketing of *River Rock*, as opposed to the loan products it offered to River Rock purchasers.

For all of these reasons, the Court concludes that Wells Fargo was not a "developer" or "agent" of River Rock within the meaning of the ILSA. Accordingly, the Plaintiff's claims under the ILSA are dismissed.

### C.    Fraud Claim

In order to state a valid claim for fraud under North Carolina law, a party must allege a false representation or concealment of a material fact that: (1) was reasonably calculated to deceive; (2) was made with the intent to deceive; (3) did in fact deceive the plaintiff; and (4) resulted in damages to the party. Anderson v. Sara Lee Corp., 508 F.3d 181, 189 (4th Cir. 2007). Additionally, the party must demonstrate any reliance on the false

representations was reasonable.  See id.  "Reliance is not reasonable where the plaintiff could have discovered the truth of the matter through reasonable diligence, but failed to investigate."  Cobb v. Penn. Life Ins. Co., 215 N.C. App. 268, 277, 715 S.E.2d 541, 549 (2011).

The conversations the Plaintiff had with Madden in the course of securing financing for her lot purchases do not support a claim of fraud.  First and foremost, it is undisputed that the Plaintiff did not speak with Madden or anyone else at Wells Fargo prior to executing the Lot Purchase Agreements. Consequently, the Plaintiff could not have relied on Madden's alleged misrepresentations in deciding to purchase the Lots, and thus, these alleged statements could not have been the cause of the Plaintiff's alleged harm. See Synovus v. Karp, No. 1:10-cv-00172-MR, 2014 WL 221209, at *8 (W.D.N.C. Jan. 21, 2014).

Even if the Plaintiff's conversations with Madden had occurred prior to the time that the Plaintiff committed to purchasing the Lots, most of Madden's representations amount to nothing more than expressions of opinions regarding the value or quality of the property as a potential investment.  "A representation which is nothing more than an opinion as to the value of property, absent something more, does not constitute actionable fraud."  Hall v. T.L. Kemp Jewelry, Inc., 71 N.C. App. 101, 106, 322 S.E.2d 7, 11 (1984).

North Carolina law recognizes an exception to the general rule that statements of opinion are not actionable "if, at the time [the statement of opinion] is made, the maker of the statement holds an opinion contrary to the opinion he or she expresses, and the maker also intends to deceive the listener." Leftwich v. Gaines, 134 N.C. App. 502, 508-09, 521 S.E.2d 717, 723, disc. rev. denied, 351 N.C. 357, 541 S.E.2d 713 (1999). The Plaintiff, however, has failed to present a forecast of evidence that Madden made any of the aforementioned statements while holding a contrary opinion.

To the extent that the Plaintiff claims to have been misled by Madden's representations regarding the high demand for River Rock lots (or North Carolina land in general), the Plaintiff has failed to present a forecast of evidence that such statements were actually false. Furthermore, to the extent that the Plaintiff claims to have been misled by Madden's representations that she would be able to refinance her lot if she could not sell it, such representations "'are not regarded as fraudulent in law,' since they are not misrepresentations of a 'subsisting fact.'" Smith v. Central Soya of Athens, Inc., 604 F. Supp. 518, 530 (E.D.N.C. 1985) (citation omitted).

Even if any of Madden's statements were actionable, no reasonable fact-finder could infer from the forecast of evidence that the Plaintiff's reliance on such statements was reasonable. "North Carolina courts consistently

have held that exaggerated representations by a seller as to property's value are mere 'puffery' on which a buyer is not entitled to rely." Stephen Dilger, Inc. v. Meads, No. 5:11–CV–42–FL, 2011 WL 1882512, at *7 (E.D.N.C. May 17, 2011) (citing Horton v. Humble Oil & Refining Co., 255 N.C. 675, 680, 122 S.E.2d 716, 720 (1961) ("Representations which merely amount to a statement of opinion go for nothing. One who relies on such affirmations made by a person whose interest might prompt him to invest the property with exaggerated value does so at his peril, and must take the consequences of his own imprudence.")).

As the Fourth Circuit has noted, reliance on "booster statements" of "enthusiastic agents" is unreasonable because such statements "are to be expected." See Glaser v. Enzo Biochem, Inc., 126 F. App'x 593, 603 (4th Cir. 2005) (citation omitted) (Wilkinson, C.J., concurring in part and dissenting in part). Here, Madden was a loan officer, and she was acting in the course and scope of her duties as a loan officer in marketing and selling Wells Fargo's financial services to a potential customer. That she appeared to affirm and approve of the Plaintiff's decision to purchase in River Rock does not change this fact. The Plaintiff has presented no forecast of evidence to show that Madden went outside of the scope of being a lender in making such statements.

Finally, the Plaintiff's claim of reliance is unjustified because she had ample opportunity to conduct an independent investigation of the property and reach her own conclusions about the development and its risks prior to purchasing the property but failed to do so. As the North Carolina Court of Appeals has explained:

> In cases involving the purchase of real property, "[r]eliance is not reasonable if a plaintiff fails to make any independent investigation" unless the plaintiff can demonstrate: (1) "it was denied the opportunity to investigate the property," (2) it "could not discover the truth about the property's condition by exercise of reasonable diligence," or (3) "it was induced to forego additional investigation by the defendant's misrepresentations."

Sunset Beach Dev., LLC v. AMEC, Inc., 196 N.C. App. 202, 209, 675 S.E.2d 46, 52 (2009) (quoting RD & J Properties v. Lauralea–Dilton Enters., LLC, 165 N.C. App. 737, 746, 600 S.E.2d 492, 499 (2004)).  Here, the parties were engaged in an arm's length transaction, and the Plaintiff was an attorney as well as a sophisticated investor.  Significantly, the Plaintiff has not presented a forecast of evidence to suggest that Wells Fargo denied her the opportunity to inspect the property or that she was otherwise reasonably induced to forego additional investigation as a result of Madden's representations.

In this respect, this case is easily distinguishable from <u>Phelps-Dickson</u> <u>Builders, L.L.C. v. Amerimann Partners</u>, 172 N.C. App. 427, 617 S.E.2d 664 (2005), a case relied on by the Plaintiff.  In that case, the plaintiff, a builder, entered into a contract with the defendant, a developer, to buy lots and build model homes based on the developer's representations about there being solid contracts to purchase lots in the subdivision, presales, and eager buyers.  <u>Id.</u> at 429, 617 S.E.2d at 666.  When those representations turned out to be false, the builder sued, asserting, among other things, claims of fraud and unfair and deceptive trade practices.  <u>Id.</u> at 432, 617 S.E.2d at 667. The trial court granted the developer summary judgment, but the Court of Appeals reversed.  In so holding, the Court of Appeals concluded that there was a genuine issue of fact as to whether the builder's reliance was reasonable because the builder had an inferior opportunity to investigate the developer's representations as that information was exclusively in the control of the developer and could not otherwise be readily or easily verified. <u>Id.</u> at 437-39, 617 S.E.2d at 670-71.

By contrast, in the present case, the Plaintiff has failed to present any forecast of evidence to establish that Wells Fargo held any superior knowledge regarding the wisdom of investing in the undeveloped lots in River Rock.  Moreover, the Plaintiff has failed to present anything to indicate that

information regarding the development was exclusively in the control of Wells Fargo and could not have been readily verified by the Plaintiff. Indeed, the Plaintiff had many means available to her to assess the value and condition of the property at issue, including independent appraisals, comparable sales data, and personal inspections of the property. The Plaintiff, however, chose to forego any independent investigation of her investment prior to purchase. Under these circumstances, Wells Fargo cannot be held liable for the Plaintiff's failure to conduct her own due diligence.

Further, the Plaintiff's asserted reliance was unjustified because her relationship with Wells Fargo was contractual and did not give rise to a fiduciary duty to ensure that the Plaintiff was making a sound investment. See In re Fifth Third Bank, Nat'l Ass'n–Village of Penland Litig., 217 N.C. App. 199, 212, 719 S.E.2d 171, 180 (N.C. Ct. App. 2011) (noting that borrowers "cited no authority tending to establish that [the lender] had a legal duty to investigate and monitor the activities of the developers and the progress of the development or to communicate to [the borrowers] the results of any such investigation or any other deficiencies associated with the [development].") cert. denied, 731 S.E.2d 687 (2012); Camp v. Leonard, 133 N.C. App. 554, 560, 515 S.E.2d 909, 913 (1999) ("a lender is only obligated

to perform those duties expressly provided for in the loan agreement to which it is a party").[7]

For all of these reasons, the Court concludes that Wells Fargo is entitled to summary judgment on the Plaintiff's fraud claim.

### D. Chapter 75 Claim

To state a claim for unfair and deceptive trade practices under Chapter 75, a party must allege sufficient facts to show "(1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or to his business." Spartan Leasing, Inc. v. Pollard, 101 N.C. App. 450, 460-61, 400 S.E.2d 476, 482 (1991). A deceptive practice is one that has "the capacity or tendency to deceive the average consumer, but proof of actual deception is not required." Id. at 461, 400 S.E.2d at 482.

To the extent that the Plaintiff's Chapter 75 claim is derivative of her claims for fraud and violations of the ILSA, such claim also fails for the reasons set forth above. See SilverDeer, LLC v. Berton, No. 11 CVS 3539,

---

[7] To the extent that the Plaintiff bases her fraud claim on Wells Fargo's use of allegedly inflated appraisals, the Plaintiff has not presented any forecast of evidence to suggest that Wells Fargo had any knowledge that the appraisals were incorrect or false in any way. Moreover, the Plaintiff has offered no forecast of evidence that she relied on these appraisals in purchasing her property. Indeed, the Plaintiff never even saw an appraisal before entering into the purchase agreement.

2013 WL 1792524, at *10 (N.C. Super. Ct. Apr. 24, 2013) (citing <u>Governor's Club, Inc. v. Governors Club Ltd. P'ship</u>, 152 N.C. App. 240, 255, 567 S.E.2d 781 (2002)).

Finally, the Plaintiff cannot establish an unfair or deceptive act based on Wells Fargo's ostensible failure to prevent her from finalizing her lot purchase during the origination and underwriting process. The Plaintiff, like the other Plaintiffs who have filed similar actions against Wells Fargo, appears to argue that because Wells Fargo was required to perform some due diligence to assess its own risk in deciding whether to make the Plaintiff a loan, the Plaintiff should be entitled to rely on Wells Fargo's representations as to the result of that due diligence inquiry. That, however, is not the law. Wells Fargo's role in this transaction was to provide financing; it had no contractual duties to the Plaintiff outside of that role. <u>See</u> <u>Camp</u>, 133 N.C. App. at 560, 515 S.E.2d at 913. Thus, there is no contractual duty to the borrower to make any assurances about the product that the borrower is buying. Moreover, a bank performs its due diligence investigation for the purpose of conducting (and protecting) *its business* – not its customers. There is no fiduciary duty that arises to the borrower. Thus, Wells Fargo had no obligation to advise the Plaintiff regarding the quality of the investment for which she sought financing. <u>See</u> <u>In re Fifth Third Bank</u>, 217

N.C. App. at 213, 719 S.E.2d at 180 (noting that lender has no "legal duty to investigate and monitor the activities of the developers and the progress of the development or to communicate to Plaintiffs . . . any other deficiencies associated with the [development]").

In sum, the Plaintiff has not presented any forecast of evidence establishing that Wells Fargo committed any unfair or deceptive action in connection with the Plaintiff's financing of her lot purchases. Accordingly, the Court concludes that Wells Fargo is entitled to summary judgment on the Plaintiff's claim under Chapter 75.

### E.    Wells Fargo's Counterclaim

Finally, Wells Fargo seeks summary judgment on its counterclaim against the Plaintiff for breach of the promissory notes.

"The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." Poor v. Hill, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000). Here, there is no dispute that the Plaintiff refinanced the River Rock Loans in April 2008 and personally executed the River Rock Refinance Notes. Further, there is also no dispute that the Plaintiff defaulted on her payment obligations under the River Rock Refinance Notes by, *inter alia*, failing to pay the outstanding principal balances set forth in those agreements. It is also undisputed that the River

Rock Refinance Notes were executed in favor of Wachovia; that Wells Fargo is the successor-in-interest by merger to Wachovia; that Wells Fargo is the current holder and owner of the original River Rock Refinance Notes; and the Notes have not been otherwise endorsed, transferred, or assigned.

While the Plaintiff argues that she does not owe Wells Fargo any money under the River Rock Refinance Notes [see generally Doc. 37], her only defenses to Wells Fargo's counterclaims are based the same alleged conduct set forth in her Complaint. [See Doc. 55-15: Pl.'s Resp. to Interrog. No. 15; Doc. 55-1: Pl.'s Dep. at 108-09, 238-39]. For the reasons discussed above, the Plaintiff has failed to forecast any evidence demonstrating fraudulent or other actionable conduct by Wells Fargo to support these defenses. Accordingly, the Court concludes that Wells Fargo is entitled to summary judgment on its counterclaims for breach of the River Rock Refinance Notes in the amount of $574,634.00, which represents the combined unpaid principal balances under those Notes. [Morin Aff., Doc. 55-17 at ¶¶ 9, 11-12].[8]

---

[8] While it appears that Wells Fargo would also be entitled to accrued interest, late charges, and attorneys' fees under the River Rock Refinance Notes, Wells Fargo has opted not to pursue such remedies. [Doc. 56 at 24 n.13].

## V. CONCLUSION

For the foregoing reasons, the Court finds that there are no genuine disputes of any material fact and that the Defendant is entitled to judgment as a matter of law as to the Plaintiff's claims and its counterclaims.

## O R D E R

**IT IS, THEREFORE, ORDERED** that the Defendant's Motion for Summary Judgment [Doc. 55] is **GRANTED**, summary judgment is hereby entered in favor of the Defendant Wells Fargo Bank, N.A. on its counterclaim for breach of the River Rock Refinance Notes in the amount of $574,634.00, which represents the combined unpaid principal balances under those Notes.

**IT IS FURTHER ORDERED** that the Plaintiff's claims against the Defendant related to the Plaintiff's River Rock Lots purchases are hereby **DISMISSED**.

A Judgment consistent with this Memorandum of Decision and Order shall be entered contemporaneously herewith.

**IT IS SO ORDERED.**

Signed: September 29, 2015

Martin Reidinger
United States District Judge